**In re: JASON CLAUDE ADKINS, Debtor.**

**MICHAEL WENTZ; BRIAN WENTZ; BMW SPORTSCARDS INC., DBA BMW SPORTSCARDS, Appellants,**
**v.**
**JASON CLAUDE ADKINS, Appellee.**

BAP No. NV-18-1204-KuTaB
Adv. No. 2:17-ap-01223-BTB

UNITED STATES BANKRUPTCY APPELLATE PANEL OF THE NINTH CIRCUIT

**Argued and Submitted: February 21, 2019**
**March 5, 2019**

NOT FOR PUBLICATION

Bk. No. 2:17-bk-11974-BTB

**MEMORANDUM**[*]

Argued and Submitted on February 21, 2019 at Las Vegas, Nevada

Appeal from the United States Bankruptcy Court for the District of Nevada

Page 2

Honorable Bruce T. Beesley, Chief Bankruptcy Judge, Presiding

Appearances: Andrea M. Gandara of Holley Driggs Walch Fine Wray Puzey & Thompson argued for appellants Michael Wentz, Brian Wentz, and BMW Sportscard Inc.; Michael J. Harker argued for appellee, Jason Claude Adkins.

Before: KURTZ, TAYLOR, and BRAND, Bankruptcy Judges.

Appellants, Michael Wentz (Michael), Brian Wentz (Brian), and BMW Sportscard Inc. dba BMW Sportscards (BMW) (collectively, Appellants), obtained a state court judgment for over $1 million against chapter 7[1] debtor, Jason Claude Adkins, based on causes of action for defamation and business disparagement. After Mr. Adkins filed his bankruptcy petition, Appellants filed an adversary complaint seeking to except the state court judgment debt from discharge under § 523(a)(6). They then filed a motion for summary judgment (MSJ) based on issue preclusion, arguing that the state court findings satisfied the willful and malicious elements of § 523(a)(6). The bankruptcy court granted partial summary judgment and the matter went to trial on the issue of Mr. Adkins' subjective intent under the willful element. After hearing testimony from Mr. Adkins, the bankruptcy court found that Mr. Adkins acted "stupidly," but lacked the

Page 3

subjective intent to harm the Appellants. This appeal followed. For the reasons set forth below, we AFFIRM.

**FACTS**

**A. Prepetition Events**

Brian and Michael Wentz each own 50% of BMW, a Wisconsin corporation, which buys and sells vintage sports cards and sports memorabilia. Mr. Adkins was familiar with the Appellants since he frequented internet blogs about sportscards, but he had never met Michael or Brian personally nor had he done business with them or their store.

On September 17, 2011, Mr. Adkins posted the following statement on the internet forum known as Blowout Cards[2] regarding Appellants:

> I know the Wentz brothers of BMW Sportscards were caught redhanded with altering certain graded cards a few years back on the Area 51 boards or whatever. . . . There was a guy that flat-out offered card restoration advertising in the Beckett Vintage magazine and was the foremost expert in card restoration. When the Wentz's [sic]



and others started working with him and getting cards slabbed 2 to 3 grades higher than they should have been, it created quite a raucous.[3]

Page 4

On September 12, 2012, Mr. Adkins posted a second statement on the Blowout Cards forum regarding Brian and BMW:

> If you think a guy is incapable of shilling his best card at auction because he's been on this board for a while and has a few thousand posts, I don't see what your logic is. A few years back Brian Wentz of BMW Sportscards claimed he was not arrested at the 2003 National for beating up another guy, yet someone else posted his arrest citation (which is public record). Wentz had 1000's of posts and was one of the biggest dealers in the nation, but he lied on the message boards about it. . . .

### 1. The State Court Complaint

About a year later, Appellants filed a state court complaint against Mr. Adkins and his business, A Stripside Comics and Sportcards. Appellants alleged three causes of action based on Mr. Adkins' posts: (1) defamation[4] with respect to the Wentz brothers and fitness for their business; (2) defamation based on Mr. Adkins' post regarding Brian's

Page 5

arrest; and (3) business disparagement.[5] According to Appellants, Mr. Adkins' post stating that they were "caught redhanded with altering graded cards" was false and disparaging and Brian was never arrested. With respect to all three causes of action, Appellants alleged that the statements were false, defamatory, and were made negligently, intentionally, and/or maliciously toward Appellants with the goal of damaging and injuring their business and pecuniary interests.

After the filing, Appellants deposed Mr. Adkins. Mr. Adkins testified that in the 2011 post about an altered card, he was referring to an 1887 Old Judge Mike King Kelly card that was transferred from a PSA 6 holder to a PSA 9 holder, which significantly increased the value of the card. Mr. Adkins testified that the card was restored by Dick Towle so that it could be graded three levels higher. Mr. Adkins also admitted that Brian was not arrested, but he explained that he meant Michael, not Brian. Finally, Mr. Adkins testified that he had spoken to Greg Schwartz

Page 6

regarding Michael Wentz to verify the information on his posts.[6]

Appellants filed a MSJ, which was unopposed. Appellants submitted the deposition testimony of Mr. Adkins, testimony from Mr. Towel who declared that he never altered or handled the Old Judge Mike King Kelly baseball card once owned by BMW, and testimony from Mr. Schwartz who declared that he spoke to Mr. Adkins once and told him he had no evidence to support the assertions against BMW or Michael Wentz.

In August 2015, the state court entered an order granting Appellants' MSJ. The court found that Mr. Adkins had admitted to making the posts and that Appellants established with undisputed evidence that both posts were false. The court further found that all the elements for defamation were met. "The undisputed evidence showed that Mr. Adkins made the posts and each was completely false and defamatory, not privileged, intentionally made and at minimum negligent, and thus the damages were presumed as the communication imputed that the Wentz brothers and BMW lacked fitness for their trade, business or profession." Under Nevada law, proof of defamation under these circumstances was per se proof of damages. The court granted summary judgment on all causes of action and

Page 7

scheduled a prove up hearing regarding the damages.[7]

In September 2015, the state court entered judgment in favor of Appellants and against Mr. Adkins for over $1 million, including attorneys fees and costs. Appellants began to execute on their judgment, which included an execution writ pertaining to property at Mr. Adkins' business. Mr. Adkins tried to prevent execution by breaking into his store and taking the most valuable property from it. Mr. Adkins was held in contempt for his actions and jailed for 25 days.

During this same time period, Mr. Adkins filed a chapter 7 bankruptcy petition in 2015. That case was dismissed. Six months later, he filed a second bankruptcy petition. That case was also dismissed.

**B. Bankruptcy Events**

About four months later, he filed the instant case in April 2017.

**1. The Adversary Complaint**

Appellants filed a complaint objecting to Mr. Adkins' discharge under § 523(a)(6), alleging in cursory fashion that the debt owed to them was non-dischargeable as it was for a debt for willful and malicious injury caused by Mr. Adkins. They also alleged Mr. Adkins' conduct in removing comic books from his store which were subject to their execution writ fell within the scope of § 523(a)(6).

Page 8

**2. The Motion For Summary Judgment**

Appellants filed a MSJ, arguing that issue preclusion applied to their state court judgment. Appellants asserted that the elements for business disparagement were equivalent to the requirements for a willful and malicious injury under the Bankruptcy Code as a showing of malice was a required element under Nevada law. Because the state court granted summary judgment on all three causes of action, Appellants opined that the court must have necessarily found malice with respect to their defamation and business disparagement claims. Appellants further maintained that the state court found that Mr. Adkins had intentionally made the false statements and therefore damages were presumed.

With respect to Mr. Adkins' subjective intent, Appellants pointed out that Mr. Adkins knew he was posting the two defamatory statements to the largest industry-specific forum for other people on the forum and all Internet users to see. According to Appellants, the state court found that, by publishing the false and extremely negative statements about Appellants' business practices and associating them with a violent crime on such a widely used and industry-specific internet platform, Mr. Adkins was aware that he would cause injuries to Appellants and should be charged with the natural consequences of his action.

Finally, Appellants alleged that the malicious element was satisfied because under Nevada law, defamation is a wrongful tortious action, done

Page 9

intentionally, which necessarily causes injury, and is done without just cause or excuse.

In the end, Appellants argued that was no genuine issue of material fact because the issues determined by the state court relating to Mr. Adkins' wrongful conduct were equivalent to those necessary to establish a willful and malicious injury under 523(a)(6). They also maintained the judgment was on the merits and a final order, the parties were the same, and the issues regarding Mr. Adkins' defamation and business disparagement of Appellants were actually and necessarily litigated.

In opposition, Mr. Adkins argued that the state court's findings did not show his subjective



intent to harm Appellants or that he subjectively knew that injury was substantially certain to occur as a result of his conduct. He further maintained that the state court's findings did not set forth the elements for maliciousness and, therefore, summary judgment should be denied.

The bankruptcy court heard the motion on February 13, 2018, and placed its findings on the record:

> ...So, Counsel, here's what we're doing to do. I'm going to grant in part the summary judgment with - on both issues with respect to portions of § 523(a)(6) with the exception of the malice requirement. Because I think they were properly tried on summary judgment in the state court. They are not opposed by opposing counsel. The only issue that remains to be tried is

Page 10

> were [sic] this individual's - or were the defendant's acts malicious, which I think we have - I do understand that I can look into circumstantial evidence about it. But the only information I have is that he admits he published these and admitted the acts that were undertaken. I think he gets a chance to say why he did that or why that wasn't malicious. I have - I can't think off the top of my head why he might find - he might be able to convince me of that, but I think he has to have a chance to do that.

Although the bankruptcy court granted Appellants' partial summary judgment, no order to that effect was ever entered.

### 3. The Motion In Limine

Appellants filed a motion in limine to exclude Mr. Adkins from presenting evidence or argument outside the scope of subjective intent for "willful injury" under § 523(a)(6). According to Appellants, the narrow issue for trial was whether Mr. Adkins had the requisite "willful" mental state for purposes of § 523(a)(6) at the time he made defamatory and disparaging statements regarding Appellants. The motion was unopposed and the bankruptcy court granted the motion.

### 4. The Trial

At the beginning of the trial, the court announced:

> THE COURT: Only thing we're hearing - only thing I'm determining today is whether there was malice with respect to certain postings that were made. And I'm relying - and I - please correct me if I'm wrong, but I'm relying on 238 F.3d . . . *Jerich v. Jerich*. And what the Ninth Circuit said is malicious

Page 11

> injury within the meaning of dischargeability exception is one which involves a wrongful act done intentionally which necessarily causes injury and is done without just cause or excuse. Is everybody on board with that being the standard?
>
> MS. GANDARA (counsel for Appellants): Your Honor, yes. Our position is that that's correct for malice. My understanding was that willfulness was the element at issue, which is an act done intentionally with the subjective intent to injury the creditor or with substantial certainty as to the result - the injurying result to the plaintiffs.
>
> THE COURT: And that is also the -



that's the definition of willfulness - also in the *Jerich* case.

MS. GANDARA: Right.

THE COURT: So if I'm hearing both of those, that's fine. They're very similar. They overlap certainly.

Ms. Gandara went on in her opening argument to say the sole issue for the trial was the willful injury requirement. Mr. Harker agreed that this was the only issue for trial - the subjective intent to cause the injury and whether Mr. Adkins subjectively believed that the injury was substantially certain to occur as a result of his actions.[8]

At the trial, Mr. Adkins testified about blogs for sportscards. Mr. Adkins explained how he obtained information from these blogs and

Page 12

passed on that information in his posts. The bankruptcy court likened this to "gossip" since the information posted was not verifiable. Mr. Adkins admitted he never saw anything first hand regarding the information he posted about Appellants; i.e., he had not seen the alleged altered card but had heard about it through the blogs. He had also seen altered cards posted by others and felt he could post about it. He further testified that he did not intend to cause injury to Appellants, had never met them, and never did business in their store. Mr. Adkins testified that he did not intend to destroy their business. According to Mr. Adkins, there were hundreds, if not thousands of posts out there about altering sportscards.

After hearing closing arguments, the bankruptcy court issued its ruling:

> So as counsel has indicated, 523(a)(6) is - it's disjunctive. It's if the debtor has a substantive or substantive motion [sic] to inflict injury or if the debtor believes that the injury is substantially certain to occur as a result of his or her conduct. And I - the conduct that has occurred in this case kind of from the beginning to the most recent efforts indicates to me at a minimum that the debtor behaved foolishly at least and perhaps stupidly. I think it was a very foolish thing to publish slanderous material against the plaintiffs in this matter. I think it was an incredibly stupid move to take property out of the store once there was a judgment against him and in order that he not take the property out of the store. I think it was a stupid

Page 13

> move that got him jailed for 25 days.[9]
>
> And I think his attitude towards is [sic] currently is not very good. It's everybody else's fault but his, which I think is an inappropriate position to be in if you're in this case. No one made him post the defamatory posts. No one made him decide it was a good idea to try and hide the assets that he did have. Those were all his choices.
>
> And he's mad about this. He's still very angry and . . . thinks he has been wronged in this case. And he is dead flat wrong that he is been wronged in this case. He has not been wronged. He has behaved poorly. He has not taken responsibility for what he did. He's not acknowledged that what he has done was improper.
>
> On the other hand, I don't think I can find that he had a subjective motive to inflict injury. Nor do I believe I can find that the injury was



substantially certain to occur in this case. With respect to the second, not likely to substantially - it's - that it's - I don't believe that the debtor believed that the injury was substantially certain to occur in the case.

The reason I say that is his testimony was that there were many blogs similar to this, that he was unaware that anybody had been caused issues by this. That I think he looked at this in a rather immature manner, but I don't think that means that he believed that the injury was substantially likely to occur. And I don't think his motive was to cause injury to the Wentzes in this case.

Page 14

And, counsel, you've been [sic] on a good argument. I think you've tried very hard in this case. But I think that what we have here is a matter of stupidity as opposed to a real effort to injure your clients. I just don't think he intended to injure your clients and I don't think that if he had thought this through, which I don't think he did, he would have thought he was going to injure your clients.

So that's my ruling. It's kinda rough, but that's my ruling. I'm going to allow this debt to be discharged.

The bankruptcy court entered an order on July 18, 2018, finding that the debt was discharged. The order provided:

. . . the Court previously having granted Summary Judgment in favor of the Plaintiffs and the sole issue as it relates to this evidentiary hearing was whether the Debtor had subjective intent to injure the Plaintiff with the acts alleged by the Plaintiff herein such that Debtor acted with malice, as described in *Petralia v. Jercich (In re Jerich)*, 238 F.3d 1202, 1209 (9th Cir. 2001).

That the Court finds that Debtor did not have a subjective motive to inflict injury on the Plaintiffs.

The Court futher finds that the Debtor did not believe that injury was substantially certain to occur to the Plaintiffs.

IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the debt owed by the Debtor to the plaintiffs is hereby found to be dischargeable and the Clerk of the Court shall enter a discharge in this case. . . .

Page 15

Appellants filed a timely appeal from this ruling.

### JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

### ISSUE

Did the bankruptcy court err in finding that Appellants failed to prove that the willful injury element under § 523(a)(6) was met?

### STANDARDS OF REVIEW

"Because the bankruptcy court entered its judgment after trial, we review the bankruptcy court's findings of fact for clear error, and its conclusions of law de novo." *Thiara v. Spycher Brothers (In re Thiara)*, 285 B.R. 420, 426 (9th



Cir. BAP 2002) (citing *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002)).

Determination of parties' intent for purposes of § 523(a)(6) is a question of fact. Factual findings are clearly erroneous if illogical, implausible or without support in the record. *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

The clearly erroneous "standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). "If the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its

Page 16

entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id*. at 573-74. That is, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id*. at 574.

**DISCUSSION**

**A. Legal Standards: Section 523(a)(6)**

Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The willful and malicious requirements are analyzed separately, and both elements must be met. *In re Su*, 290 F.3d at 1146-47; *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010). Appellants had to prove that the injury to them was both willful and malicious, not just one or the other.

The only issue at trial and on appeal is whether the willful element was met.[10] Appellants bore the burden of proof by a preponderance of the evidence in order to render Mr. Adkins' debt nondischargeable. *Grogan v. Garner*, 498 U.S. 279, 291(1991). "The burden of showing something by a 'preponderance of the evidence,' ... 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence

Page 17

before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993).

Whether a debtor acted willfully is a subjective inquiry: the "willful injury requirement is met only when the debtor has a subjective motive to inflict injury or when the debtor believes that injury is substantially certain to result from his own conduct." *In re Ormsby*, 591 F.3d at 1206. Further, when determining the debtor's intent under § 523(a)(6), there is a presumption that the debtor knows the natural consequences of his actions. *Id*.

Subjective intent may be gleaned from objective factors and circumstantial evidence which tends to establish what the debtor must have actually known when taking the injury-producing action. *Su*, 290 F.3d at 1146 n. 6. Reckless disregard is insufficient to establish willfulness under § 523(a)(6). *Geiger*, 523 U.S. at 61, 118 S.Ct. 974, 140 L.Ed.2d 90; *Su*, 290 F.3d at 1145-46. The Ninth Circuit wrote in *Su*:

> That the Bankruptcy Code's legislative history makes it clear that Congress did not intend § 523(a)(6)'s willful injury requirement to be applied so as to render nondischargeable any debt incurred by reckless behavior, reinforces application of the subjective standard. The subjective standard correctly focuses on the debtor's state of mind and precludes application of § 523(a)(6)'s nondischargeability provision short

of the debtor's actual knowledge that harm to the creditor was substantially certain. 290 F.3d at 1145-46.

Page 18

**B. Analysis**

Appellants argue that the bankruptcy court erred in its findings that Mr. Adkins did not have subjective motive to inflict injury or believe that injury to Appellants was substantially certain to occur. Appellants point to Mr. Adkins' testimony during trial which, in Appellants' view, amounted to admissions about his subjective knowledge of injury to the Appellants:

> Q Do you see where it says that- discusses card alteration as a dirty little secret
>
> A Oh, yes, I see it.
>
> Q Okay. When you're using that language you are implying that there is a negative connotation to card alteration?
>
> A Yes.
>
> Q Okay. And so by associating the plaintiffs being caught red-handed altering cards, your imputing on them this bad conduct. Is that right?
>
> A Yes.
>
> Q Okay. I'm going to have you look at the second to last and last sentence of that post where it says.
>
> "There was a guy that flat-out offered card restoration advertising in the Beckett vintage magazine and was the foremost expert in card restoration. When the Wentzes and others started working with him getting card slabbed 2 to 3 grades higher than they should have been, it created quite a

Page 19

ruckus."

> Is this content, are you suggesting that the Wentzes were improperly improving the grades of their card by alteration?
>
> A Yes.
>
> Q Okay. And your last part of that sentence says, "And my name is my ID and I live in Vegas. Feel free to check my arrest record. They never caught me breaking the law, except for that speeding ticket in 2010." Do you see that?
>
> A Yes.
>
> Q In that sentence, are you trying to disassociate yourself or make yourself appear like a good guy in relation to these people who have committed crimes?
>
> A Yes.
>
> Q Okay. So you knew that the statement would harm the plaintiff's business and public reputation, correct?
>
> A Yes.
>
> Q You didn't think that it would help their business, right?
>
> A Yes.
>
> Q It would hurt them?
>
> A Yes.

Page 20



However, later in the trial, in response to his attorney's questions, Mr. Adkins testified:

> A I wasn't trying to do any harm to them. I just- I guess if you want to call it passing gossip because it's not verified, then again, you know, what news is these days. But, yeah, if you want to call it gossip boards. Most of the time people say, hey, I- look at this card, I found it a garage sale. And they post a picture of it. You generally believe them if they're a longtime member, so -
>
> Q Right.
>
> A I guess that's still gossip that they have it. I don't -
>
> Q All right. But -
>
> THE COURT: So if you weren't trying to harm them or - I mean, how could you send out something that says these people are misbehaving and not think that would cause harm?
>
> THE WITNESS: I'd just seen it so many - from so many other people. I didn't - like I said, I wasn't trying to harm them. I guess I was just passing along information that was out there.

Later, Mr. Adkins' attorney, Mr. Harker, resumed his questioning:

> Q Well, let me ask this then. You didn't believe this would harm their business. Is that a fair statement?
>
> A That's fair.
>
> Q Why did you not believe it would not - it would harm would

Page 21

not harm their business?

> A It's just people talking sports cards and there's plenty of statements like this about them. So I certainly would never start rumors or lie, trying to hurt anybody ever.
>
> Q How many statements would be posted today in general like this on this website?
>
> A Probably 10,000 posts a day.
>
> Q Okay. And when you put-posted this, although you've admitted to the court that you've never seen it [the altered card] in person but you had seen stuff on the internet, it was just a post that you are passing on. Is that a fair statement?
>
> A Yeah. It was just, oh, by the way. And like I said, I was under the impression it was common knowledge throughout the industry.
>
> Q You didn't know these individuals. Is that correct?
>
> A That's correct.
>
> Q All right. You didn't have a vendetta against them, did you?
>
> A No.

The bankruptcy court was entitled to consider both direct evidence of Mr. Adkins' subjective state of mind and evidence of the surrounding circumstances, and then to make appropriate inferences as to whether he

Page 22

harbored the requisite intent for purposes of deciding whether his acts were willful under § 523(a)(6). Appellants understandably emphasize Mr. Adkins' testimony on cross-examination

during which he conceded that the statements he made in his posts would harm the Appellants. Appellants characterize Mr. Adkins' testimony as an admission and thus conclusive evidence that he knew damage to Appellants was substantially certain to occur due to his posts.

However, Mr. Adkins' later testimony was conflicting. He stated many times that he did not intend to harm the Wentzes or their business. Mr. Adkins also futher explained the surrounding circumstances; i.e., what he was doing on the blog, how he obtained information about the Wentzes and BMW, and how he used the blog to pass on information that he had "heard" about the Wentzes and BMW. He also did not know the Wentzes, had never done business with them, and testified that he had no vendetta against them.

It was up to the bankruptcy court to determine the weight and credibility to give to Mr. Adkins' conflicting testimony. Once the court understood the surrounding circumstances, other inferences could be drawn about whether Mr. Adkins had the subjective intent to inflict the injury or whether he believed that injury was substantially certain to occur as a result of his conduct.

Viewing the record in its entirety, Mr. Adkins' later testimony

Page 23

supports the bankruptcy court's conclusion - he acted stupidly and foolishly. He never thought about how inaccurate the information was on the blog that he "passed on" to others. He had no vendetta against the Wentz brothers or BMW and had never met them or done business with them. This testimony coupled with Mr. Adkins' testimony about posting on sportscards blogs in general supports the inference that Mr. Adkins had no subjective motive to inflict injury on the Appellants nor did he believe that injury was substantially certain to result from his own conduct.

In sum, although Mr. Adkins' testimony was contradictory at times, "[i]f the [bankruptcy court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573-74. That is, the bankruptcy court's choice among multiple plausible views of the evidence cannot be clearly erroneous. *Id.* Based on the facts and evidence in the record, and all reasonable inferences from those facts, the bankruptcy court could properly conclude that Mr. Adkins did not act willfully within the meaning of § 523(a)(6). Accordingly, we discern no clear error.

## CONCLUSION

For the reasons stated, we AFFIRM.

--------

Footnotes:

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

[2] Blowout Cards is a sports card distributor that hosts an online forum where sports card collectors from all over the world can access the forum for free and talk to each other about sports cards through post published comments that others can read and respond to in a dialogue.

[3] Grading of sports cards is done on a rating scale from 1 through 10, with cards in the worst grading condition receiving a 1 and cards in the most immaculate condition receiving a 10, and accordingly the highest value. The primary sports card grading company is Professional Sports Authenticator (PSA).



[4.] Under Nevada law, an action for defamation requires the plaintiff to prove four elements: "(1) a false and defamatory statement ...; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages." *Clark Cty. School Dist. v. Vitual Educ. Software, Inc.*, 213 P.3d 496, 504 (Nev. 2009). If the defamatory communication imputes a "person's lack of fitness for trade, business, or profession," or tends to injure the plaintiff in his or her business, it is deemed defamation per se and damages are presumed. *Id*.

[5.] Under Nevada law, the elements required to prove a cause of action for business disparagement differ from the elements required to prove classic defamation and defamation per se. *Clark Cty. School Dist.*, 213 P.3d 504-05. To succeed in a claim for business disparagement, the plaintiff must prove: (1) a false and disparaging statement, (2) the unprivileged publication by the defendant, (3) malice, and (4) special damages. *Id*. The principal differences between defamation per se and business disparagement concern the elements of intent and damages. Business disparagement requires malice. Malice is proven when the plaintiff can show either that the defendant published the disparaging statement with the intent to cause harm to the plaintiff's pecuniary interests, or the defendant published a disparaging remark knowing its falsity or with reckless disregard for its truth. *Id*.

[6.] Initially Mr. Adkins was represented by counsel in the state court lawsuit but could not afford to pay him. Accordingly, he appeared pro se.

[7.] Mr. Adkins had filed a counterclaim for abuse of process. The state court also granted Appellants' MSJ on the counterclaim.

[8.] Indeed, this was the only issue addressed by the parties in the trial.

[9.] There was little, if any, emphasis on whether Mr. Adkins' contemptuous conduct satisfied the willful and malicious requirements for § 523(a)(6).

[10.] Since no issues have been raised with respect to the malicious requirement, those arguments are waived. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).

--------

